543 So.2d 252 (1989)
William Larry MOORE, Appellant/Cross Appellee,
v.
Carol Jeanne MOORE, Appellee/Cross Appellant.
No. 87-2329.
District Court of Appeal of Florida, Fifth District.
April 10, 1989.
Rehearing Denied May 19, 1989.
*253 Charles J. Collins, Jr., Orlando, for appellant/cross appellee.
Melvin B. Wright, of Gurney & Handley, P.A., Orlando, for appellee/cross appellant.
SHARP, Chief Judge.
William Moore, the former husband, appeals from a final judgment of dissolution of marriage. Carol Moore, the former wife, cross appeals from a denial of an award of attorney's fees and costs. We reverse in part and remand for further consideration in view of this court's opinion. If the trial court determines the wife has a need for an award of attorney's fees, and it is equitable to require the former husband to pay them, on remand the trial court may do so.
William argues that the trial court erred in four respects:
1) In valuing the marital assets which were equitably distributed as of the date of the final hearing, October 15, 1987, rather than valuing them as of 1981 when the parties first maintained permanent residences in different cities;
2) In its decision to award permanent periodic alimony rather than rehabilitative alimony;
3) In requiring the former husband to pay medical and health insurance premiums for coverage of his former wife, in addition to "rehabilitative alimony," (essentially the cost of six months inpatient treatment in a mental health hospital); and
4) In requiring the former husband to maintain the former wife as a beneficiary of his presently existing life insurance policy or one of equal value.
Our function as an appellate court, is to read the record in a manner most partial to the party who obtained the more favorable judgment being reviewed. Only if we find an abuse of discretion by the trial court should we reverse. See Diffenderfer v. Diffenderfer, 491 So.2d 265 (Fla. 1986); *254 Marcoux v. Marcoux, 464 So.2d 542 (Fla. 1985); Manto v. Manto, 509 So.2d 981 (Fla. 2d DCA 1987); Murphy v. Murphy, 475 So.2d 1253, 1254 (Fla. 5th DCA 1985); Brown v. Brown, 472 So.2d 873, 875 (Fla. 2d DCA 1985); Marlow v. Marlow, 464 So.2d 717, 719 (Fla. 2d DCA 1985). The trial court has a very broad ambit of discretion in resolving issues raised in dissolution cases. Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980); Szemborski v. Szemborski, 530 So.2d 361 (Fla. 5th DCA 1988).
The record in this case establishes that the parties were married for twenty-two years, and that they were blessed with two children, both of whom were over eighteen years of age when the dissolution proceedings were filed. The wife also had three children by a prior marriage. These three unfortunately created problems for themselves and their mother. They got into drugs and alcohol, ran away from home; and one was convicted of a felony. According to a psychiatrist, who both parties agreed should examine Carol and testify in court, these three children caused her to sink further and further into a chronic depressed mental state.
At the beginning of the parties' marriage, both were employed, and they had no substantial assets or premarital properties. They lived in Atlanta where Carol's family also lived. They moved to Florida in the mid-1960's. William was employed by the Smith Container Corporation of Georgia, and he continued to work for the same employer throughout the marriage.
After the parties moved to Florida, they purchased a residence, and their two children were born. Carol stopped working outside the home for a time. William continued to advance in his position with Smith Container, and he began to earn vested rights in a profit-sharing plan provided by his employer. From 1973 to 1979, Carol worked as a secretary and office manager. Her highest salary was $350.00 gross, per week.
In 1979, William told Carol that Smith Container was requiring him to transfer back to Atlanta. Carol later discovered that the transfer was not required by William's employer, but had been voluntary on his part. Carol remained in Florida for the balance of the school year with the children. Then the family packed up their belongings, put their four bedroom house on the market, and moved into a townhouse in Atlanta. Carol also had to resign from her job in Florida.
In Atlanta, the family did not fare well. The one child by Carol's prior marriage, who was living with them, began to have problems in school and with drugs. William's and Carol's two children, who had come from a gifted school program, did not have a comparable school curriculum available in Atlanta, and they were unhappy and missed their friends. Carol began slipping into severe depression. Some days she could barely function well enough to do basic housekeeping for the family.
The house in Florida had not sold when the next summer began. Carol and the children asked William if they could return to spend the summer in Florida. He agreed and helped them move down a few pieces of furniture, which had been stored in Atlanta. When they arrived at their former home, everyone was very happy. William told Carol that the move to Atlanta had been a mistake.
The parties' testimonies differ on the next step in this marital odyssey. Looking solely at Carol's version, William told her he would return to Atlanta and obtain a transfer back to Florida. During the first few years, William made frequent visits to Florida on vacations and business trips. He was Smith Container's Vice-President of Sales, and was required to travel frequently. The children went back to their former school, but Carol's mental health did not improve.
In 1981, William finally told Carol he could not obtain a transfer back to Florida. The company viewed his request as "vacillating" and his supervisors said he would be asked to resign if he pursued the transfer request. Carol's response was that she did not want to cost him his job. She told him she could not go back to Atlanta, and said she thought they should seek a divorce.
*255 Until 1985, the parties' marital relationship went into a limbo situation. William refused to divorce Carol, but he visited less and less frequently. At first he supported Carol and the household generously. He paid her $2,000 per month. She ran the household and took care of the family. But she was not able to hold a job, although she tried. The depression continued and it affected her memory and energy level drastically.
Carol's ability to pay household bills began to slip. William had to take over paying the mortgage and car payments. He began to steadily reduce the funds he sent Carol. Because of her chronic depression, she was unable to work. Carol asked for funds to repair the residence and pool, but did not receive them.
In 1985, William came for a visit. There was a physical altercation between the parties. That was when, in Carol's mind, any chance of saving their marriage was lost. There was evidence that Carol had developed a relationship with another man. William then agreed they should divorce.
The residence in Florida seriously deteriorated after 1981. At trial, seven repairmen who had provided estimates on the house testified. The roof had broken down to such a point it could not be repaired. It had to be completely replaced. In places the roof had fallen in and the sky was visible from the rooms below. Water damage to walls, cabinets, plumbing, and wiring was extensive. A low bid of $21,000 and a high of $27,000 was the cost to repair the residence to make it saleable.
The real estate appraiser selected by both parties, testified that the house was not saleable in its present condition. If properly restored, it would have a fair market value of $92,000. The trial judge found that the reasonable cost of repairs was $26,000.
William testified that he had worked for Smith Container for over twenty years, during the full course of his marriage to Carol. He said he had hoped to reunite the family until 1986. While employed by Smith Container, he earned vested rights in a profit sharing plan, which was worth $122,283.88 in October of 1987. Aside from the residence and William's pension, the parties had acquired other marital assets of less substantial value: guns, $500; boat and trailer, $4,000; William's IRA account, $6,000; furniture, $3,000; piano $750; cars, $11,000.
The dissolution judgment appealed from in this case awarded Carol $2,000 per month as permanent periodic alimony. It made an equitable distribution of the marital assets, which favored Carol on a roughly 56/44 percent basis. She was awarded the residence (its present value, minus existing mortgage, $64,300); plus $32,366.94 from the profit sharing plan, plus another $13,000 from the plan to pay for half the cost needed to make the residence saleable; her car ($6,500); the piano ($750); and furniture ($1,000), for a total of $117,916.94. William received the balance remaining on the profit sharing plan ($76,916.94), his IRA ($6,000), his auto ($4,500), the boat and trailer ($4,000), furniture ($2,000) and the guns ($500); for a total of $93,916.94.
Shortly after the final dissolution hearing but before final judgment was entered, "black Monday" occurred, reducing the value of William's pension profit-sharing plan to $111,944.34. This was called to the attention of the trial judge in a motion for rehearing, but no modification in the judgment was made. If $111,944.34 is the accepted value of the pension profit-sharing plan, as appellee's counsel appears to concede on appeal, then William's share of the marital assets must be further reduced to $83,577.40, now a 58.5/41.5 percent ratio in Carol's favor.
An award of permanent alimony, as opposed to rehabilitative alimony, is a determination left largely to the discretion of the trial judge. We as an appellate court should not evolve rules of law which eliminate the exercise of discretion by the trial judge,[1] and must affirm if there is a reasonable basis in the record for such a determination. Walter v. Walter, 464 So.2d 538 *256 (Fla. 1985); Canakaris; Mann v. Mann, 523 So.2d 804, 805 (Fla. 3d DCA 1988). Here, two psychiatrists testified at trial that Carol (although only forty-seven years old) was disabled by chronic depression. She has been unable to be gainfully employed since 1981. She is suicidal and not motivated to help herself to get well. One psychiatrist said she might be able to become employed after three to six months inpatient treatment. Without it, she would be unable to function well enough to hold a job.
Given the length of the marriage and Carol's poor prospects for becoming self-supporting, we cannot say the trial court erred in awarding permanent periodic alimony. The additional $1,500 per month rehabilitative alimony awarded would, we agree with appellant, have been excessive. However, as both parties point out, under the terms of the dissolution judgment, Carol had to elect to undergo inpatient treatment within sixty days of the entry of the judgment. She did not do so and therefore this aspect of the appealed judgment is moot.
The amount of permanent alimony awarded is also within the discretion of the trial judge. Carol's financial affidavit establishes a need for roughly $1,700 per month, plus $700 for psychiatric therapy. In addition, William was required to provide medical and health insurance for Carol under his company plan, or an equivalent plan. Including life insurance coverage, this will cost William approximately $2,197 per month.
Since Carol has neither income nor any prospects for earning income, and has proven a need for monies close to the amount awarded, the issue is whether the award is in excess of William's ability to pay. William's earnings from his employer are rising each year. In 1987 he earned a gross salary of $73,956, plus a $2,000 bonus. He is in good health, and has good prospects for continuing further salary increases for a number of years. An accountant testified that if William were required to pay Carol $2,000 per month in permanent periodic alimony, because of the impact of tax deductions, he would have $38,039 in spendable net income. Carol would have spendable net income of $20,922. Although this award appears on the high side, it is we think, within the lower court's discretion under the reasonableness test. Canakaris; Marcoux; Walter.
In view of the generous award of permanent periodic alimony, however, we find the disproportionate division of marital assets in Carol's favor questionable. We have often said that a 50/50 split of marital assets is not required, but is a good starting point. See Poe v. Poe, 522 So.2d 50, 51 (Fla. 5th DCA 1988); Laman v. Laman, 490 So.2d 985, 986 (Fla. 5th DCA), rev. denied, 500 So.2d 544 (Fla. 1986); Marston v. Marston, 484 So.2d 32, 34 (Fla. 2d DCA), rev. denied, 494 So.2d 1151 (Fla. 1986); Tuller v. Tuller, 469 So.2d 212, 213 (Fla. 5th DCA 1985); Ente v. Ente, 442 So.2d 232 (Fla. 5th DCA 1983); Mahaffey v. Mahaffey, 401 So.2d 1372 (Fla. 5th DCA 1981). Where one spouse receives substantial permanent periodic alimony, we have sustained an unequal distribution of marital assets to that spouse. Mahaffey; Mundy v. Mundy, 498 So.2d 538 (Fla. 1st DCA 1986). Further, where one spouse has performed extraordinary services during the marriage, an unequal division may be justified. See, e.g., Beasley v. Beasley, 508 So.2d 23 (Fla. 4th DCA 1987); Tommaney v. Tommaney, 405 So.2d 454 (Fla. 2d DCA 1981).
However, in this case no such extraordinary circumstances exist. Viewing the testimony most favorably to Carol, she played the role of homemaker and child raiser for most of the marriage. She did not contribute directly to William's business or career. Theirs was a strange and apparently unhappy marriage for many years. Perhaps William was as much to blame as Carol for not ending it sooner, as the trial judge apparently concluded. However, even the most favorable reading of the record does not justify a 58.5/41.5 split favoring Carol. Jennings v. Jennings, 510 So.2d 994 (Fla. 1st DCA 1987); Rico v. Rico, 487 So.2d 1161 (Fla. 5th DCA 1986); Adamson v. *257 Adamson, 458 So.2d 1152 (Fla. 2d DCA 1984).
Appellant argues that the court should have picked a valuation date of 1981 for the marital assets, since the parties resided thereafter in different states. However, the choice of dates to value marital assets is largely up to the trial judge's discretion. Perlmutter v. Perlmutter, 523 So.2d 594 (Fla. 4th DCA 1987), rev. denied, 531 So.2d 1354 (Fla. 1988). Date of the dissolution hearing is the most common date selected. Perlmutter. Given the testimony at trial, the trier of fact could have concluded the parties' marital family relationship continued until 1987, and strange though it was, both parties consented to the status quo. However, we agree with William that the value of the profit sharing plan should equitably have been based on the post-crash values, since the judgment was dated after black Monday.
In summary, we think the marital assets should be valued and totalled as follows:

Profit sharing $111,944.34
IRA 6,000.00
Home 64,300.00 (present value less
 existing mortgage)
Cars 11,000.00
Guns 500.00
Boat & Trailer 4,000.00
Piano 750.00
Furniture 3,000.00
 ___________
 $201,494.34

This sum should thereafter be split between Carol and William in an equitable manner. If the trial judge felt Carol should receive the residence, she should be accorded the full present value of the asset, $64,300. However, William should not be assessed an additional $13,000 "penalty" for letting it fall into disrepair. Its present value already includes the total reduction for needed repairs. If Carol is to receive the residence, she should not then receive more than $36,450 in total value of the remaining marital assets  or at the most, an award of $28,200 out of the profit-sharing plan.
We are also concerned with the provision in the final judgment which requires William to maintain Carol as beneficiary of his presently existing life insurance policy or its equivalent until Carol dies or remarries. William argues this is tantamount to an award of post-mortem alimony. This kind of award is not permissible under Florida law absent an agreement by the parties. O'Malley v. Pan American Bank of Orlando, 384 So.2d 1258 (Fla. 1980); Gregg v. Gregg, 474 So.2d 262 (Fla. 3d DCA 1985); Mahan v. Mahan, 415 So.2d 146 (Fla. 2d DCA), rev. denied, 424 So.2d 762 (Fla. 1982); Eagan v. Eagan, 392 So.2d 988 (Fla. 5th DCA 1981). No such agreement exists in this case.
However, section 61.08(3) provides:
(3) To the extent necessary to protect an award of alimony, the court may order any party who is ordered to pay alimony to purchase or maintain a life insurance policy or a bond, or to otherwise secure such alimony award with any other assets which may be suitable for that purpose.
§ 61.08(3), Fla. Stat. (1987). Based on this statute, the final judgment should be amended to reflect that the required insurance is for the sole purpose of protecting alimony arrearage, up to an amount reasonably required to protect the award of permanent periodic alimony. See Dwyer v. Dwyer, 513 So.2d 1325 (Fla. 2d DCA 1987). On remand, the trial court shall limit Carol's beneficial interest in the policy to an amount reasonably required to protect against arrearage, and the trial court shall consider whether security is necessary under the circumstances. See Sobelman v. Sobelman, 516 So.2d 7 (Fla. 2d DCA 1987).
Accordingly, we affirm the dissolution judgment as to its award of permanent alimony, but reverse and remand the equitable distribution of marital assets for reconsideration within the parameters of this opinion. We also direct that the trial court reconsider and revise its provision for life insurance so as to achieve compliance with section 61.08(3). Further, we affirm the trial court's denial of attorney's fees and costs for the former wife, based on their present roughly equal financial status. However, if the trial court on remand substantially reduces the former wife's distribution of cash assets, it may reconsider *258 this issue in view of the new judgment and its financial consequences to the parties.
AFFIRM in part; REVERSE in part; REMAND.
DAUKSCH and DANIEL, JJ., concur.
NOTES
[1] Walter v. Walter, 464 So.2d 538, 539 (Fla. 1985).