625 So.2d 856 (1993)
Karl SCHILLER, Appellant/Cross-Appellee,
v.
Ann Darlene SCHILLER, Appellee/Cross-Appellant. Herman Schiller, S & S Associates, a general partnership, and Dayton Excel Mold & Die, Inc., an Ohio corporation, Appellants,
v.
Ann Darlene Schiller, Appellee.
Nos. 92-1300, 92-1484.
District Court of Appeal of Florida, Fifth District.
October 5, 1993.
*857 Christopher W. Wickersham, Sr. of Christopher W. Wickersham, Sr., P.A., Daytona Beach, for Karl Schiller.
Random R. Burnett of Black, Crotty, Sims, et al., Daytona Beach, for Herman Schiller, S & S Associates, and Dayton Excel Mold & Die, Inc.
Dwight Chamberlin of Monaco, Smith, Hood, Perkins, Loucks & Stout, Daytona Beach, for Ann Darlene Schiller.
W. SHARP, Judge.
Karl Schiller appeals from a final judgment of dissolution of marriage and his former wife, Ann, cross-appeals. He argues the trial court erred in awarding Ann too large a share of the parties' marital assets, in fashioning the award to include his partnership interest in S & S Associates, and in awarding Ann permanent alimony and attorney's fees. Ann argues the trial court failed to take into account various marital assets expended by Karl for his sole benefit, after the parties' separation. S & S is a Florida general partnership owned fifty percent by Karl and fifty percent by Herman Schiller, a longtime business associate.[1] We agree the trial court erred in its attempt to distribute Karl's partnership interest to Ann, and in its award of attorney's fees to her, in view of the other awards made in the final judgment.
We also consolidate with the Schiller dissolution appeal,[2] Herman Schiller's appeal from the trial court's denial of his motion to intervene in the dissolution case, after final judgment had been rendered.[3] These cases were heard together at oral argument. Because both appeals involve related questions of partnership law in Florida (the Uniform Partnership Act, Ch. 620), we consolidate them for disposition in this proceeding. We affirm the trial court's denial of Herman's motion to intervene, based in part on the outcome we reach in the dissolution case.
The record establishes that Karl and Ann married in 1958. Ann was primarily a housewife and mother, although she helped Karl both when he started his business in Ohio *858 (Dayton Excel Mold & Die, Inc.), and after it was moved to Daytona Beach. The business makes steel molds for plastic industrial and commercial parts. Herman Schiller became Karl's associate in this business in Ohio. It was operated as a closely held corporation, with Karl and Herman each owning fifty percent of the stock.
In 1982, Karl and Herman moved the business to Daytona Beach, Florida. It is currently operating under the name Daytona Mold. Initially, Karl and Herman and their spouses took title to unimproved land on Fentress Boulevard in Daytona Beach, in their individual names. A special manufacturing building was built for their business, and was financed by a bank loan. All four individuals signed the mortgage and note, and currently remain liable on the remaining mortgage indebtedness.
The title to the real estate was transferred to a general Florida partnership named S & S Associates. It is owned fifty percent by Herman and fifty percent by Karl. The partnership agreement contains prohibitions against the sale or assignment of a partner's interest in the partnership without the other's consent. S & S's sole assets are the Fentress Boulevard real estate and the building used by Daytona Mold for its business operations. Daytona Mold pays rent to S & S, which is used to pay the mortgage on the property.

Equitable Distribution
The trial judge entered a lengthy written order which appears to comply substantially with the fact-finding and valuation requirements of section 61.075(1) and (3). The parties stipulated that the bulk of their properties were marital assets. Except for the value of Daytona Mold and some airplane parts and frames, the parties stipulated to the value of the other marital assets.
The court awarded the former wife:

1) House & real property at Pebble $ 50,000 (equity)
 Beach
2) 1982 Mercedes $ 3,000
3) 50% interest in S & S Partnership $221,153 (value)
 (land and building at 720 Fentress
 Boulevard, Daytona Beach, Florida)
 which interest is in Husband's
 name
 _________
 Total $274,153

The court awarded the former husband:

1) Daytona Excel Mold & Die Co., $224,769
 Inc. d/b/a Daytona Mold, 1/2 of all
 stock
2) 1978 Anniversary Corvette $ 9,000
3) Two Messerschmitt airplane parts $ 12,000
 and frames
4) Bass boat, John boat and trailer $ 5,000
5) Real property in Naples, Florida $ 11,000
 _________
 Total $263,269

The parties presented expert witnesses and exhibits to arrive at a valuation of the Daytona Mold business, and the resulting value for fifty percent of its stock owned by Karl. Karl's expert testified his stock was worth $125,000. However, he did not include any value for goodwill, even though Daytona Mold has generally outperformed others in the same business over a twenty-year period. Ann's expert witness established a value of $231,944 for Karl's one-half interest. The court resolved this controversy by considering the values established for the equipment (less five percent of its fair market value), and less depreciation, and added to that a value for goodwill, officer loans as assets, and book value. Its determination that Karl's one-half share was worth $224,769 is within the discretion of the court and is based on substantial evidence.
The fair market value of the airplane parts was highly controverted. Shortly after the parties separated in 1987, Karl traveled to Europe at least twice. One trip was for the purpose of buying two World War II German Messerschmitt airplanes, which had been disassembled and were in pieces. He testified he spent at least $30,000 to buy them and have them shipped to the Fentress plant in Daytona. He financed the purchase and currently owes $20,000 on that indebtedness.
As a member of the Valiant Air Command Club, Karl planned to renovate the planes, and hopes to put them in flying or saleable condition. It will take much time and effort. If successful, Karl could sell one for as much as $65,000, although his witness, McDonald, testified that buying such an airplane is a "gamble" and a "labor of love." He thought the planes currently were only worth $8,000, because they had not been de-registered in France.
*859 The court made findings that Karl had expended at least $32,000 on the planes, against which there is a $20,000 indebtedness. If the plane were de-registered in France, the expert opined they would be worth $15,000. No clear testimony was offered as to why the planes could not be de-registered. Karl continues to pay a substantial monthly sum for the airplane debt. Based on this record, we cannot overturn the court's finding that the planes are currently worth $12,000.
Based on the values found by the court, Karl received marital assets worth $262,269. Ann's distribution was valued at $274,153. The split is close to equal  only a $11,884 disparity. Given the size of the total marital assets and their nature, it may not have been feasible to divide them more equally. But on remand, the court (in its discretion) may readdress this matter.
By way of explanation for this less than fifty/fifty split of marital assets, Ann argues that after their separation, Karl spent substantial marital funds for his own purposes, and the court failed to account for an investment credit he received, as well as other expenditures for which there is no existing asset. She points out Karl purchased a $5,200 Cadillac, obtained a $22,000 investment credit payment from S & S and spent $17,000 on flying lessons and trips to Europe. However, pursuant to section 61.075(3)(d), the trial court is directed to expressly state its rationale for distribution of marital assets and allocation of liabilities. We can no longer, as an appellate court, search the record for reasons or factors the trial court might have relied upon in fashioning its awards.
On this point, the court expressly stated it was not going to give any marital asset credit for Karl's purchase of the Cadillac and its later sale for $3,200, nor his expenditure of $17,800 of marital funds for his flying lessons, trips to Europe and vacations. However, such considerations could have justified the less than fifty/fifty split of marital assets, in this case.[4] On remand, the trial court may revisit this part of the decree.
The part of the equitable distribution judgment being appealed in this case which concerns us, is the outright award to Ann of Karl's fifty percent interest in the S & S Partnership, and its attempt to award her a fifty percent interest in the partnership assets (the land and building). Since adoption of the Uniform Partnership Act in Florida, it is well established that a creditor of an individual partner cannot levy directly on a partner's interest in a partnership, nor on the partnership assets. Anderson v. Potential Enterprises, Ltd., 596 So.2d 488 (Fla. 5th DCA 1992); Century Bank of Lee County v. Gillespy, 399 So.2d 1109 (Fla. 5th DCA 1981); Myrick v. Second National Bank of Clearwater, 335 So.2d 343 (Fla. 2d DCA 1976). See also Addis v. Addis, 288 Ark. 205, 703 S.W.2d 852 (1986); Warren v. Warren, 12 Ark. App. 260, 675 S.W.2d 371 (1984); Berry v. Berry, 635 P.2d 68 (Utah 1981); Schultz v. Ziegenfuss, 105 N.J. Super. 468, 253 A.2d 180 (A.D. 1969). This is intended to protect the interests of the other non-debtor partners, and to prevent disruption of the partnership business.[5]
A general partner's interest in a partnership is characterized as personal property.[6] It consists solely of the partner's right to receive a fair share of the profits and surplus, and the net partnership assets, after dissolution of the partnership. § 620.685, Fla. Stat. (1989). See In re Marriage of Paul, 821 P.2d 925 (Colo. App. 1991); 8 Fla. Jur.2d Partnership § 478. Under the Uniform Partnership Act, the only way to reach a partner's interest in a partnership is to impose a charging lien pursuant to section 620.695 for a specific dollar amount on the partner's interest, by court order. See Atlantic Mobile Homes, Inc. v. LeFever, 481 So.2d 1002 (Fla. 4th DCA 1986); Addis; Warren; Riegler v. Riegler, 243 Ark. 113, 419 S.W.2d 311 (1967); Baum v. Baum, 51 *860 Cal.2d 610, 335 P.2d 481 (1959); In re Marriage of Paul; 59 Am.Jur.2d Partnership § 790.
On remand, the trial court in this case should award Ann a specific dollar amount for the value of Karl's interest in S & S Partnership. That sum would likely be $221,153, if the court chooses to distribute to Ann the total value of Karl's interest in the partnership. Pursuant to section 620.695, the court may retain jurisdiction to enforce the charging lien by sale of the partnership interest, appoint a receiver to obtain payments Karl would be entitled to receive, or take such other actions as Karl could take, with regard to the operation of the partnership, to obtain payment of the debt owed to Ann. 59 Am.Jur.2d Partnership § 793 and 795; See Krauth v. First Continental Dev.-Con., Inc., 351 So.2d 1106 (Fla. 4th DCA 1977). The purchaser of an interest in a partnership after enforcement of a charging lien may ultimately apply for dissolution of the partnership and ultimately, the partnership assets could be reached. § 620.695, Fla. Stat. (1989). See Smithson v. Smithson, 1984 WL 1580 (Ark. App. 1984) (not reported in S.W.2d).
Imposition of a charging lien can take place in the context of this dissolution case, upon remand. See In re Marriage of Weiss, 695 P.2d 778 (Colo. App. 1984); Craig v. Craig, 1982 WL 899 (Ark. App. 1982) (not reported in S.W.2d). Herman Schiller, as the other general partner, should be notified and joined as a party to the proceeding to impose a charging lien on Karl's partnership interest.[7] He will then be afforded an opportunity to protect his interest in the S & S partnership.

Intervention
Intervention in a lawsuit after final judgment, essentially for purposes of taking part in an appeal, is rarely permitted.[8] It is allowed only if the interests of justice so require and the intervenor stands to lose or gain valuable rights, dependent upon the outcome of the case.[9] Herman, as Karl's fifty percent partner in the S & S Partnership, does not have such an interest in the dissolution proceeding.
However, had it been possible to seize and convey to Ann a fifty percent interest in the partnership assets or her former husband's partnership interest, Herman Schiller would have had a strong case to seek intervention in the dissolution case below. As a fifty percent partner, his interest in the partnership assets would have been clearly affected by the judgment in a direct and immediate way.[10] In effect, he would have been forced into a partnership with Ann in Karl's place, contrary to the partnership agreement and his consistent denial of consent. Refusal to consent to an assignment of a partner's interest in a partnership, where required by a partnership agreement, prevents any such assignment and such provisions in partnership agreements are enforced. § 620.645, Fla. Stat. (1989). See In re O'Connell 119 B.R. 311 (M.D.Fla. 1990).
However, provisions in a partnership agreement requiring consent to assignment of a partner's interest in a partnership cannot be used to shield a partner's interest in the partnership from the claims of that partner's individual creditors. See Jones v. Palermo, 105 Misc.2d 405, 432 N.Y.S.2d 288 (1980); 59 Am.Jur.2d Partnership § 796. As stated above, such a debt or claim is enforced by imposing a charging lien on the debtor partner's partnership interest. This remedy is intended to be flexible and protect the ongoing business and other partner's interest in the partnership. Imposition of a charging lien also requires notice and joinder of the other partners so they can protect their own interests.
For these reasons, the trial court properly denied Herman's motion to intervene in the *861 dissolution case proper. The court could not grant Ann an interest in the partnership assets or transfer to her Karl's interest in the partnership. Thus, Herman lacked standing to intervene.[11] However, on remand, Herman should be notified and allowed to join in any further proceedings if it might result in imposition of a charging lien on Karl's partnership interest.

Permanent Alimony
Karl argues the trial court abused its discretion by awarding Ann permanent alimony and in setting it at $450 per week. Pursuant to sections 61.08(1) and (2), the court made findings to justify the alimony award.[12] The court expressly found:
This is a 30-year marriage during which time Husband was the main bread winner, while Wife was the chief homemaker and child rearer and also contributed to Husband's business from time to time. Even when Wife was in good health, Husband still had superior earnings. The parties enjoyed a good standard of living, always maintaining nice homes and driving new vehicles, one normally a sports car and maintaining from time to time a recreational boat. Wife's present health lessens any earnings she would otherwise have and after dissolution, she will be required to be responsible for her own health insurance, while Husband's company will provide his. Wife is in need of alimony and Husband has the ability with which to pay same.
The record below clearly shows Ann was properly awarded permanent alimony. She is in poor health and unlikely to ever become self-supporting. She is without any other sources of income. It was a long term marriage to which she contributed substantially. And, the nature of the marital assets are such that her distributed share will not provide her with a source of income upon which to maintain herself any where near the standard of living she enjoyed during marriage.
Supporting the trial court's award of $450.00 per week is Ann's financial affidavit, which was not challenged at trial. It established she has living expenses of more than $3,000 per month. During separation of the parties, Karl voluntarily paid her $450 per week in support. By court order, temporary support was set at $600 per week. It was later reduced to $500 per week.
At the trial, the evidence established Karl's gross salary is at least $1,000 per week, exclusive of financial benefits furnished by Daytona Mold and the partnership (such as health insurance). In addition to paying Karl's health insurance, the business pays him approximately $75 per month (an average) reimbursement of expenses, and he has business credit cards which pay for his entertainment. None of these sums are reflected in Karl's financial affidavit. The court found his current income was $52,000 per year, although it had been higher in prior years.
The court's award to Ann of $450 per week, or $23,400 per year is less than one-half of Karl's gross salary. Both parties will pay income taxes only on their share and Karl will get a deduction for the alimony payments he makes. Ann must purchase her own health insurance, which will deplete her alimony. Although this award might appear to be high at Karl's current income level ($1,000 per week), because of Ann's needs, and his nontaxable business benefits which elevate his real net income, it falls within the trial court's discretion. Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980); Marcoux v. Marcoux, 464 So.2d 542 (Fla. 1985).
In light of our reversal of the equitable distribution to Ann of the partnership interest, we must also vacate the alimony award. See Hamlet v. Hamlet, 583 So.2d 654 (Fla. 1991); Collinsworth v. Collinsworth, 624 So.2d 287 *862 (Fla. 1st DCA 1993). Since the judgment must be considered as an integral whole rather than separate pieces, the trial court's new scheme of equitable distribution may require a change in alimony.[13]

Attorney's Fees
The court in this case awarded Ann all of her attorney's fees and costs, and reserved jurisdiction to determine the amount of fees to be awarded. Karl argues his attorney and Ann's stipulated that the issue of whether to award attorney's fees, as well as the amount, would be argued after the trial concluded. However, the trial court never allowed Karl's attorney to argue the merits of whether to award attorney's fees in this case. The statements of record by counsel on this question are very brief, and somewhat ambiguous.[14]
Assuming the court properly determined Karl's attorney waived arguing against an attorney's fee award for Ann in this case, we think the award must be reversed on the merits, if the alimony and equitable distribution awards remain substantially as fashioned by the trial court. This court has repeatedly held that when a dissolution decree leaves the parties in substantially equal financial circumstances, it is an abuse of discretion to award one party attorney's fees against the other. See Wilkerson v. Wilkerson, 623 So.2d 1192 (Fla. 5th DCA 1993); Moore v. Moore, 543 So.2d 252 (Fla. 5th DCA 1989); Ariko v. Ariko, 475 So.2d 1352 (Fla. 5th DCA 1985). In this case, the trial court split the marital assets roughly equally, and awarded the former wife close to one-half of her former husband's gross income. Neither has any nonmarital assets or nonmarital sources of income, and neither has substantial liquid assets of any kind.
On remand, the trial court may also revisit this award as part of reconsidering this cause as a whole. See Collinsworth. But, if the parties are left, after the dissolution awards, in substantially equal financial circumstances, no attorney's fees should be awarded. Accordingly, we reverse and remand this cause for further consideration consistent with this opinion.
REVERSED and REMANDED.
GRIFFIN and DIAMANTIS, JJ., concur.
NOTES
[1] Herman and Karl are not related, although they have the same last name.
[2] Schiller v. Schiller, Case No. 92-1300.
[3] Schiller, et al. v. Schiller, Case No. 92-1484.
[4] Compare Gentile v. Gentile, 565 So.2d 820 (Fla. 4th DCA 1990). See Gregory, The Law of Equitable Distribution (1989) para. 9.02[2] and [4].
[5] Angle v. Angle, 506 So.2d 16 (Fla.2d DCA), rev. denied, 513 So.2d 1060 (Fla. 1987); Myrick v. Second National Bank of Clearwater, 335 So.2d 343 (Fla. 2d DCA 1976).
[6] Atlantic Mobile Homes, Inc. v. LeFever, 481 So.2d 1002 (Fla. 4th DCA 1986).
[7] 59 Am.Jur.2d Partnership 791.
[8] Dickinson v. Segal, 219 So.2d 435 (Fla. 1969); People's Bank of Jacksonville v. Virginia Bridge & Iron Co., 94 Fla. 474, 113 So. 680 (1927).
[9] See In re Adoption of a Minor Child, 593 So.2d 185 (Fla. 1991).
[10] See Citibank N.A. v. Blackhawk Heating, 398 So.2d 984 (Fla. 4th DCA 1981); Trawick's Florida Practice & Procedure §§ 4-9 (1992).
[11] See In re the Marriage of Edward N. Claughton, Jr. v. Beverly Claughton, 625 So.2d 853 (Fla. 3d DCA 1993); Marks v. Marks, 609 So.2d 710 (Fla. 4th DCA 1992).
[12] In summary, this was a long-term marriage; there were two children; Karl is in good health; Ann is fifty-four years old and has had chronic health problems with her bladder and persistent back pain; Karl's present income is $52,000 per year, and has been consistently at least that much in past years. Ann has no income and she is presently unemployed.
[13] We received an emergency motion concerning a recent dispute involving other persons as to whether the S & S partnership or the individual partners (Herman and Karl) actually own the real estate on Fentress. If appropriate, the trial court may revisit this issue on remand.
[14] The transcript reflects the following:

Mr. Smith (Ann's counsel): On attorney's fees, do you want to leave that to be determined by the court, to be decided at a later date?
Mr. Wickersham (Karl's counsel): Yea, we'll just reserve it.
Mr. Smith: Reserve that, your Honor.